Decided 16 June, 1902.

## MARTIN v. EAGLE DEVELOPMENT CO.

[69 Pac. 216.]

VERITY OF RECORD IS PRESUMED.

1. An objection that the court erred in rendering a decree without proof of any of the material allegations in the complaint denied by the answer is untenable where the findings of fact recite that they were made from "the admission of the pleadings and the evidence taken," since such recital imports verity and precludes inquiry.

ELEMENTS OF CAUSE OF SUIT FOR FRAUD OR DECEIT.

2. To sustain a suit based on fraud or deceit it must appear that there were false representations of material import concerning the subject-matter of the contract, made by the other party with knowledge of their falsity, or made as of his own knowledge, not knowing whereof he spoke, for the purpose of misleading and deceiving, and such representations must have been relied upon, to the injury of the deceived party.

FRAUD—INSUFFICIENT PROOF OF DECEPTION.

3. Where a purchaser of mining property alleged fraud in the vendor's representations that he was the owner of a certain number of inches of water in a certain creek, and had made a valid and indefeasible location thereof, but it appeared that immediately after the purchase the purchaser relocated the water claimed by the vendor,—its notice reciting that the same had been sold to the purchaser,—it was apparent that the purchaser knew the interest owned by the vendor, and hence was not misled.

JUDICIAL NOTICE OF MEANING OF WORDS.

4. Under Hill's Ann. Laws, § 708, subd. 1, providing that courts shall take judicial notice of the meaning of all English words and phrases and all legal expressions, such notice will be taken only of the ordinary meaning of current words and phrases; and, if an unusual meaning is sought to be attached to words used in pleadings, such meaning must be explained. The following illustrates this : Defendants alleged fraud in the sale of mining property in that plaintiffs falsely represented that the land would yield gold not less than ten cents per yard "from the grass roots down," and that plaintiffs had "prospected" the land and knew the value thereof. *Held,* that, as the expression "from the grass roots down" ordinarily means to the center of the earth, and not merely to bedrock, and as "prospected" ordinarily means to do experimental work to ascertain the probable value of a mining claim, and not

to accurately ascertain the actual value by sinking holes to bedrock and testing the earth, plaintiffs' alleged misrepresentations were apparently mere expressions of opinion, and not statements of fact, and if any other meaning attached to the expressions used, it should have been pleaded.

FRAUDULENT REPRESENTATION—KNOWLEDGE OF MAKER.

5. Where defendant alleged that plaintiffs on sale of mining property were guilty of fraud in representing that a certain ditch could be constructed for a certain sum, and that plaintiffs, after the sale, undertook to construct the ditch for the amount for which they represented it could be done, and failed, but there was no showing that plaintiffs' entered on the work without intending to complete it, or knew that it could not be done for the price they had named, it was not made to appear that plaintiffs' statement as to the cost of the ditch was made with knowledge of its falsity.

MORTGAGEE'S NOTICE OF PRIOR EQUITABLE CLAIM.

6. Plaintiffs sued to recover mining property which they had conditionally sold to defendant company under a contract providing that certain improvements should be made. A mortgagee alleged that his mortgage was for money loaned to the company to make the improvements under the provisions of the contract. *Held,* that, if it was loaned for this purpose, the mortgagee must have known of the contract and its conditions, and must therefore have taken subject to plaintiffs' rights thereunder.

CORPORATIONS—PRESUMED KNOWLEDGE OF STOCKHOLDERS—ESTOPPEL.

7. Plaintiffs were stockholders in a corporation, and had a claim on certain property of the corporation which they had sold to it. The corporation mortgaged the property, the mortgagee having notice of plaintiffs' claim. *Held,* that in the absence of any showing that plaintiffs were present at the stockholders meeting where the mortgage was authorized, or actually consented thereto, the mere fact that they were stockholders did not estop them from asserting their rights under the contract.

From Union: ROBERT EAKIN, Judge.

On November 18, 1897, the plaintiffs, Killes J., Oliver, G. M., and Nellie Martin, of the first part, and the Eagle Creek Development Co. of the second part, entered into an agreement whereby the parties granted the Development Company an option to purchase certain mining claims for the consideration of $16,000, of which $4,000 was paid down, and also granted with said option the right and privilege of prospecting, exploring, and mining the same until the 15th day of December, 1897, at which time, if the company so desired, the right and privilege should be extended to the 20th day of December, 1898, upon the payment of an additional $4,000, at which latter date the balance of $8,000 should be paid if the company elected to purchase. The company agreed to commence the

work of exploration and development of the mining property within a reasonable time, and to construct a sluicing ditch for the purpose of conveying the water from Eagle Creek to the claims, to be used in hydraulic mining, and to complete said ditch, ready for operation, not later than July, 1898. It was further provided that, upon payment of the additional $4,000, the completion of the sluicing ditch, the installment of a No. 3 giant for hydraulic mining, and the setting of pipes to connect the same, the Martins should execute a bond for a deed for the further protection of the Development Company, and that, upon making all the payments as stipulated for, they should make, execute, and deliver to the Development Company a deed conveying a perfect title to said mining claims (except the fee simple of the United States), and also a good and sufficient conveyance of title to all the water rights filed on by them on Eagle Creek and its tributaries. As a further consideration for such option, the Development Company agreed to cause to be issued to the Martins one sixteenth of the capital stock of the company on or before January 1, 1898. It was further agreed that the Development Company might decline to make any of the payments designated, when due, upon the surrender of the contract, and that time was of the essence of the agreement. Thereafter the agreement was so modified as to extend the time of final payment to November 1, 1899. A deed was executed and delivered to the Development Company to the water rights on the same day, and at once recorded. Subsequently the company entered into possession of the mining lands and the water rights, and built and constructed a sluicing ditch,—the same, it is alleged, as was intended to be constructed under the contract. The company also installed a No. 3 giant, set pipes to connect the same with the ditch with the view to hydraulic mining, and completed the plant, and performed considerable labor and development work. These matters are alleged in the complaint, and it is further averred that, although plaintiffs have complied with all the conditions of the agreement on their part, the Development Company has made default, and has failed and refused

to make any payments as stipulated for by the agreement, except the first, and that was made by note, which is wholly unsatisfied; that the company abandoned the property, and the same, including the water rights, ways, ditches, as well as all improvements, betterments, etc., were left unattended and uncared for, whereupon plaintiffs duly notified the company of their intention to declare the contract forfeited, and subsequently took possession of all said property. It is further alleged that the company executed a mortgage to Lewis A. Hall upon the ditch and water rights, which is an apparent lien upon the property described in the contract, and that he took the same with notice and knowledge of plaintiffs' rights, and that the other defendants claim an interest in the property, wherefore plaintiffs pray a forfeiture of the contract; that the sluicing ditch and improvements be deemed to have been constructed and made for their benefit, and they be declared to be the owners thereof; that the mortgage and conveyances mentioned be declared to be clouds upon their title; and for other relief.

All the defendants seem to have answered, admitting the agreement, but denying substantially all the allegations of the complaint, except the execution of the mortgage to Hall and a deed to Anderson Finley; and, for a further and separate defense, it is alleged, in effect, that in the summer of 1897 Killes J. and G. M. Martin pretended and represented that they, the said Martins, were the owners of 2,000 miners' inches of the water of Eagle Creek; that they had made a valid and indefeasible location, and had the right to appropriate the same or to transfer it, and did at the same time pretend and represent, that said mining claims were very rich in gold bearing mineral, if worked as placer mines with hydraulic appliances; that they would yield in gold not less than ten cents per yard of earth from the grass roots down, and from one end of said claims to the other; that Killes J. Martin was an old and experienced miner, had thoroughly prospected and examined said claims, and knew what he was talking about, and that what he said about their richness could absolutely be relied

upon; that the said representations were made with the purpose of inducing the sale of the property; that plaintiffs did further represent and pretend that it would be necessary, in order to properly mine and work said placer ground, to construct a ditch or flume some three or four miles in length to conduct the water thereto from Eagle Creek; that they were experienced ditch builders, and that such a ditch, sufficient to carry 5,000 inches of water, could be constructed for a sum not to exceed $4,000; and that they would, if the sale could be effected, undertake to construct it for that sum; that plaintiffs assured the company, through its agents, that said representations were true, and thereupon the Eagle Creek Development Co. incorporated for the express purpose of purchasing said placer property, and working and mining it for gold; that, having no knowledge of mining, or the richness or the value of said property, or the cost of said ditch, but believing and relying on the representations of the plaintiffs, the Development Company entered into a contract with them as set out in the complaint; that plaintiffs knew at the time that said representations were false, and made for the purpose of cheating, overreaching, and defrauding the Development Company; that upon the signing of the contract the Development Company discovered that Killes J. and G. M. Martin were not the owners of 2,000 inches of the water of Eagle Creek, and that the only claim they had thereto was based upon a defective and wholly insufficient notice of appropriation recorded in Union County, whereupon the company was obliged to, and did, make a location of water for itself, and did on November 18, 1897, relocate the said 2,000 inches of water so pretended to be located by said Martins, and, in addition thereto, did locate and appropriate of the water of Eagle Creek 5,000 inches in addition, and did at the same time file a notice of the pre-emption of the right of way for said ditch. The notice recites, among other things, that said company "claims and has a valid right to the enjoyment and use of 7,000 inches of water, miners' measure, under a six-inch pressure, to be conveyed through said ditch or flume to the placer mining

grounds situate at the junction of Eagle Creek with East Eagle Creek, together with, all and singular, the appurtenances, which notice is intended to cover an appropriation of 2,000 inches of water, which appropriation was made by Killes J. and G. M. Martin on May 8, 1897, and which water right has this day'' (November 18, 1897) been sold and assigned to the company, and also 5,000 inches additional, to be devoted and used as indicated.

Continuing, it is further alleged that the company acquired from the United States the right of way of said ditch through the public domain, and entered into a contract with Killes J. and Oliver Martin to construct said ditch for the sum of $4,000, but that they failed to perform their obligation, and the company completed the same at an expense of $16,000; that plaintiffs are stockholders in said company; that, owing to their failure to construct said ditch, it became necessary to carry on and complete the work; that after its completion the company prosecuted systematic and thorough mining operations on said claims, but was unable to secure gold enough to pay the expenses of taking it out of the ground, and that gold does not exist in said claims in sufficient quantities to pay for extracting the same; that the company, in building said ditch and making the improvements mentioned, expended $25,000; that the defendant and Anderson Finley are the exclusive owners of the ditch, giant, pipes, tools, appliances, and buildings, subject to the mortgage of Lewis A. Hall; that the company is ready and willing to release and turn over to the plaintiffs all interest in the claims described, except the right of way to said ditch, buildings, and improvements; and that, by reason of the false and fraudulent representations of the plaintiffs, the company was induced to enter into said contract, and to construct said ditch and make the improvements mentioned, to their great damage in the sum of $28,000.

And the defendant Clarence Cole for a separate answer, alleges that the Development Company entered into a contract with the Martins as alleged in the complaint, and, as a part consideration, agreed to issue and deliver to plaintiffs one six-

teenth of the entire capital stock of the company, which was accordingly done, and the stock received and accepted, and is owned and held by them; that in the construction of the ditch contemplated, and the purchase of tools, machinery, etc., the company was obliged to, and did, expend large amounts of money, and that, to supply the necessary means to carry forward the work under the provision of the contract, Lewis A. Hall advanced from time to time, ranging from April 10, 1898, to November 22d, money aggregating $15,560.61, to enable it to carry on said work, and perform the terms and conditions of said contract with the plaintiffs; that at a regular annual meeting, of which all the stockholders had due and legal knowledge, by resolution duly adopted the company was authorized to execute a note for the sum mentioned to said Hall, and a mortgage upon the property to secure the same, which was accordingly done in November, 1898. Then follow appropriate allegations of recording, assignment to Cole, and default in payment; and it is further alleged that Hall made the loan and took the mortgage without notice or knowledge of the conditions of said contract; that plaintiffs knew the purpose for which said mortgage was given, and made no objections, but consented thereto, and received the benefits thereof in proportion to their interest in said corporation under the contract. The defendants pray that Anderson Finley be declared to be the owner of all the property described in the complaint, except the placer claims, for $28,000 damages, and for a foreclosure of the Hall mortgage. A general demurrer was interposed and sustained to each of these separate answers, and, the defendants refusing to answer further, a decree was entered in accordance with the prayer of the plaintiffs, and the defendants appeal.          AFFIRMED.

For appellants there was a brief and an oral argument by *Mr. O. B. Mount.*

For respondents there was a brief and an oral argument by *Mr. Charles E. Cochran.*

MR. JUSTICE WOLVERTON, after stating the facts, delivered the opinion of the court.

1. The defendants counsel insist preliminarily that the trial court erred in rendering a decree for the plaintiffs in the absence of any proof to support any material allegations of the complaint denied by the answer. It is, however, not conceded by opposing counsel that no evidence was taken at the trial. None has been brought up, but we find the following recital in the record, prefacing the findings of fact: "and now, from the admission of the pleadings and the evidence taken before the court and filed in this suit, the court finds,"—which indicates the basis for the court's action. The recital precludes further inquiry upon the subject. The record imports verity, and we cannot look behind it and say that the decree was rendered without proof sufficient to support the disputed allegations of the complaint.

2. The next contention is as to the sufficiency of the first separate defense, which is based upon fraud and deceit. As essential elements to sustain it, there must have been false representations of material import concerning the subject-matter of the contract, the plaintiffs knowing them to be false, or representations as of their own knowledge, not knowing the truth whereof they spoke, for the purpose of misleading and deceiving the Development Company; and the company must have relied upon such representations, believing them to be true and was misled thereby to its injury: 7 Am & Eng. Ency. Law (1 ed.), 12, 17; *Rolfes* v. *Russel,* 5 Or. 400; *Bullit* v. *Farrar,* 42 Minn. 8 (43 N. W. 566, 6 L. R. A. 149, 18 Am. St. Rep. 485).

3. The first representation relied upon as being false is that the Martins were the owners of 2,000 miners' inches of the water of Eagle Creek; that they had made a valid and indefeasible location, and had the right to appropriate the same and transfer it. Further averments in the answer, however, disclose the fact to be that the Development Company must have known and did know the exact interest the Martins owned in the alleged water right at the time, for it posted and and

had recorded at once a notice relocating the 2,000 inches that plaintiffs claimed; reciting that appropriation had been made thereof by them, and that the same had been sold and assigned to the company. With such knowledge, it could not well assert that it was deceived by the representations of plaintiffs, whatever might have been their falsity. It was not misled thereby, nor induced to act to its detriment, because it was fully advised to the contrary.

4. The next consists in the representation that the mining claims were very rich in gold; that if worked as placer mines, with hydraulic appliances, they would yield in gold not less than ten cents per yard from the grass roots down, from one end of the claim to the other; that one of the Martins had thoroughly prospected and examined the claims; and that what he said could be relied upon; and these representations are alleged to have been false, to the knowledge of the plaintiffs. But the latter combat the contention that these are sufficient upon which to base the defense, with the suggestion that the representations consist in mere matters of opinion, and must be so construed. But whether that be so or not, there is a vital defect in statement in two particulars. In support of the answer the Development Company insists that the expression "from the grass roots down" means, in mining parlance, from the grass roots to the bed rock, and that it was so understood by miners; and that the term "prospected," as applied to placer mines, signifies that holes have been sunk to the bed rock, and a test made of the earth in each, and the average ascertained. If such are the significations of the expression and the term, unless they are such as ordinarily attach thereto, they should have been explained, to make them intelligible. Judicial notice will be taken of the true signification of all English words and phrases and all legal expressions: Hill's Ann. Laws, § 708, subd. 1. It is the ordinary meaning of current words and phrases to which the notice extends: 17 Am. & Eng. Ency. Law (2 ed.), 896: *Nix* v. *Hedden,* 149 U. S. 304 (13 Sup. Ct. 881). The expression, "from the grass roots down," in its ordinary or literal sense means

to the center of the earth, and that is as far as judicial notice can be expected to extend. If it has a peculiar significa-tion; peculiar to a locality or to a particular industry; differ-ent from the ordinary one,—of this the court will not take notice. "To prospect" signifies "to explore for unworked deposits or ore, as a mining region;" "to do experimental work upon, as a new mining claim, for the purpose of ascer-taining its probable value": Century Dict. This is the com-mon or current acceptation of the term. That it means what counsel would ascribe to it is foreign to such an acceptation, and we cannot be expected to take judicial notice that it has such a meaning. So that, if the meanings defendants ascribe attach to the phrase and word under discussion, they should have made them understood by appropriate allegations; other-wise the answer does not state a cause of defense within the cognizance of the court, and is therefore deficient in that par-ticular.

5. The next alleged representation pertains to the cost of constructing the ditch, but it appears that plaintiffs were willing to undertake the work of construction for $4,000,—the same amount they represented it could be done for,—in which undertaking they failed, and the Development Company took up the work and completed it at a much greater cost. It does not appear that plaintiffs entered upon the work without in-tending to complete it, or or that they knew that it could not be done for the sum named, so that a false representation, knowing it to be false, cannot be imputed from the fact. This disposes of the questions presented as to the first separate defense, and, being in harmony with the action of the trial court, it follows that the demurrer thereto was properly sus-tained.

6. The separate answer of the defendant Cole depends for its sufficiency upon whether it shows that Hall took the mort-gage *bona fide* and without knowledge of plaintiff's equities. The plaintiffs had executed and delivered to the Development Company a deed to their water rights, and this was regularly placed on record, so that, according to the record, the Develop-

ment Company appeared to be the owner. The deed was executed in pursuance of the contract entered into between plaintiffs and the company for the purpose of aiding the latter in doing the work contemplated by the contract if it desired to proceed under the option thereby accorded. It is alleged, in effect, that to supply the necessary means, and to enable the company to carry forward the work under the provisions of the contract, Hall advanced the money; being the same for which the mortgage was given. Now, if he advanced it for the purpose designated, he must have known of the contract, and consequently of its terms and conditions, and hence that whatever rights or interest in the property he has acquired by virtue of the mortgage are subordinate to the equities of the plaintiffs. The answer, therefore, does not show him to have been an innocent purchaser, but quite to the contrary.

7. There is another contention in this connection,—that plaintiffs were stockholders in the Development Company, and, having had notice of the meeting at which the mortgage was authorized, they were estopped to deny Hall's alleged superior equities. It does not appear that any of the plaintiffs were present at such meeting and participated in or assented to the execution of the mortgage of the company. The mere fact that they were stockholders does not estop them to insist upon their rights under the contract, the interest of Hall having been acquired with notice of such rights.

The demurrer to this answer was, therefore, also properly sustained; and having now disposed of all the questions presented, favorably to the respondents, the decree of the trial court will be affirmed.                              AFFIRMED.